UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

STEVE BALISTERI, et al.,

Plaintiffs,

vs.

MENLO PARK FIRE PROTECTION DISTRICT,

Defendant.

Case No: C 10-03102 SBA

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Dkt. 37, 38

Plaintiffs, former and current firefighters employed by the Menlo Park Fire Protection District ("District"), bring the instant wage and hour action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C § 207(a). The Complaint asserts two distinct claims: (1) the District fails to compensate them for time spent picking up their turnout (protective) gear from their home stations in cases where they are assigned to another station; and (2) the District fails to properly calculate their overtime wages.

The parties are presently before the Court on Plaintiffs' Motion for Partial Summary Judgment and Defendant's Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment, pursuant to Federal Rule of Civil Procedure 56. Dkt. 37, 38. Having read and considered the papers submitted and the record in this action, and being fully informed, the Court hereby GRANTS Defendant's motion, DENIES Plaintiff's motion and enters final judgment in favor of Defendant on all claims. The Court, in its discretion, resolves the pending motions without oral argument. Fed. R. Civ. P. 78(b); Civ. L.R. 7-1(b).

# I. BACKGROUND

## A. FACTUAL SUMMARY

Plaintiffs are eighty-two firefighters, EMTs and/or paramedics (collectively "firefighters") currently or previously employed by the District. Compl. ¶ 3, Dkt. 1. The District maintains seven fire stations within its thirty square-mile service area in southern San Mateo County. Joint Separate Statement of Undisputed Material Facts Supporting Parties' Cross-Motions for Summ. J. ("Joint Facts") ¶ 2, Dkt. 37-1. At each of those stations, the District has adopted a 24-day work period, pursuant FLSA provisions governing employees engaged in fire protection activities. Id. ¶ 6. The District schedules its firefighters to work two consecutive twenty-four hour shifts, followed by ninety-six hours (four days) off. Id. ¶ 4. Shifts begin and end at 8:00 a.m. Id. ¶ 5.

Firefighters are assigned a "home station," where they typically works their regularly scheduled hours. Shapelhouman Decl. ¶ 4, Dkt. 37-3. The District provides each firefighter with two sets of outer protective safety clothing (referred to as "turnout gear") along with two gear bags to store and transport these items. Id. ¶ 5. Firefighters typically store their turnout gear, as well as their personal toiletries, at their home station. Sweeney Decl. ¶ 2, Dkt. 38-12. However, the District does not require them to do so, as firefighters are free to store their gear at home. Shapelhouman Decl. ¶ 5.

### 1. Temporary Station Assignments

On occasion, firefighters may have to work at a "temporary station"; that is, a station other than their home station. Assignments to a temporary station typically arise in three situations. Joint Facts ¶ 14. The first is when a firefighter is already on shift at his home station and must travel to a temporary station for part or the remainder of that shift. Shapelhouman Decl. ¶¶ 7-8. In that circumstance, the District compensates firefighters for time spent gathering their turnout gear and travelling to the temporary station, as they already are on-duty when instructed to transfer. A second situation arises where an off-duty firefighter is called in to work an emergency overtime shift. Id. ¶ 9. In that instance, the firefighter is on-the-clock as soon as he receives a telephone call summoning him to

duty. Id. If the emergency shift is at a temporary station but the firefighter's gear is at his home station, the firefighter is paid for the time spent retrieving the gear, because his emergency shift is deemed to begin upon receipt of the call to duty. Id.

The third situation—which is at issue in this case—arises when a firefighter works a voluntary overtime shift at a temporary station. Id. ¶¶ 11-12. In that instance, the District contacts firefighters who are already working on a shift to offer them a future, overtime shift. Id. At that time, the District informs the firefighter whether the assignment will be at his home station or at a temporary station. Id. A firefighter who volunteers for an overtime shift at a temporary station is expected to report directly to the temporary station; he is not required to check in or sign in at his home station before travelling to the temporary station. Id. ¶ 12.

Because the firefighter knows of the temporary station assignment while on duty, he has the ability to bring his turnout gear home so that he can travel from his home directly to the temporary station without stopping at his home station. Id. ¶¶ 5, 6, 10, 12. In fact, one of the purposes of providing an extra set of turnout gear and a second gear bag is to allow firefighters to store and transport their gear in personal vehicles when assigned to another station. Id. As a result, the District does not compensate firefighters for the time spent gathering turnout gear from the home station and transporting it to the temporary station before that later shift. However, Plaintiffs contend in this action that under the FLSA the District should compensate them for the time spent packing their turnout gear and travelling to their assigned temporary station.

**2. The District's Annual Leave Program**

The second aspect of this case arises from the District's Annual Leave program. Until 1996, the District separately provided for vacation and sick leave. Id. ¶ 13. Under the pre-1996 system, at the time of separation, the District paid each firefighter 100% of accrued vacation leave and 25% of accrued sick leave. Id. This system imposed a heavy financial burden upon the District due to the unfunded liability created by these potentially large accruals. Id. Accordingly, in 1996, the District eliminated the separate sick and

vacation leave programs and replaced them with a combined Annual Leave program under which accrued leave could be used for any purpose. Id. At the time the program was implemented, firefighters were allowed to roll over their then accrued sick and vacation time into an ESL Bank, subject to a 480-hour cap that operates separately from the Annual Leave Bank's new accrued hours. Id. ¶ 13.[1]

The Annual Leave program is governed by a Memorandum of Understanding ("MOU") between the District and the Menlo Park Fire Fighters Association, IAFF Local 2400 ("Union"), the most recent version of which is dated June 1, 2006-June 30, 2008. Braucht Decl. ¶ 2 & Ex. 1, Dkt. 37-4. The provisions addressing the Annual Leave program are principally set forth in § 9 of the MOU, which states that "[a]ll represented employees shall receive annual leave in lieu of separate vacation and sick leave." MOU § 9.1 (emphasis added). Under the MOU, the amount of annual leave accrued is based on a composite of the accruals for vacation and sick time. Id. Ex. 1 §§ 9.2 (Ex. B to MOU), 10.1. Although the accrual rate for vacation and sick time differ, the aggregate amount of time accrued is treated simply as Annual Leave. Braucht Decl. ¶ 4. Thus, from June 2006 to August 8, 2010, Plaintiffs accrued a "lump sum" of leave hours per pay period, which were deposited directly into the Annual Leave Bank. Braucht Decl. ¶ 3, Dkt. 37-4. The Annual Leave Bank does not distinguish sick leave and vacation hours; rather, any hours in the bank can be used for any purpose. Id. ¶ 4.

In November 2008, the Union filed grievances against the District regarding the use and accrual of Annual Leave. Id. ¶ 5. On June 22, 2010, the Union and the District resolved the grievances by entering into a Settlement Agreement that renegotiated the rules governing leave accrual. Id. ¶ 5. Under the settlement, the District changed its method of tracking Annual Leave, effective August 9, 2010. Id. ¶ 6. Now, the first six hours accrued in each pay period enter the Annual Leave Bank automatically. Id. The remainder of the

[1] For those employees with more than 480 hours of accrued sick time, the District created an Extended Sick Leave Bank ("ESL Bank"), which allowed the employee to retain those hours, subject to certain restrictions. Id. After its creation in 1996, no further hours accrued in the ESL Bank. Id.

accrued hours is placed in an Annual Leave Restricted Bank ("Restricted Bank") in which it remains for the remainder of the calendar year. Id. Hours in the Restricted Bank cannot be used during the year the hours accrued. Id. At the end of the year, however, those hours are rolled into the Annual Leave Bank, at which point the employee may use them for any absence, regardless of purpose. Id.

In order to mitigate its liability for banked but unused leave hours, the District maintains a practice of cashing out excess hours from Plaintiffs' Leave Bank every February. Id. ¶ 7. The first step in calculating the buy-back amount requires the District to determine the employee's balance of Annual Leave Bank hours as of the December 31. Id. ¶ 8. In the second step, the District subtracts from that balance the maximum number of hours that the employee would have been able to pre-schedule for leave (less 144 hours) in the current calendar year. Id.[2] The District's administrative staff automatically issues the buyback compensation each year. Id. ¶ 9. The District has never included the amount of the annual buy-back compensation in the Plaintiffs' Regular Rate. Joint Facts ¶ 19.

### B. PROCEDURAL HISTORY

On July 15, 2010, Plaintiffs filed the instant action against the District asserting two claims under the FSLA. In their first claim, Plaintiffs allege that they entitled to compensation for time spent picking up and returning their turnout gear to and from their home station when they are assigned to a temporary station. Their second claim alleges that the District improperly fails to include the amount of Plaintiffs' buy-back in calculating their overtime pay. Each side now moves for summary judgment in their favor. The matter has been fully briefed and is ripe for adjudication.[3]

---

[2] If the employee has an ESL Bank, the buy-back consists of a payment equal to 100% of the hours remaining, after the deduction. Id. For employees without an ESL Bank (i.e., employees hired after 1996), the District takes the number of hours remaining after step two and subtracts 480 hours. Id.

[3] Along with its opposition to Plaintiffs' motion for summary judgment, the District submitted objections to certain portions of the declaration of Plaintiff Mike Sweeney. Dkt. 40-1. Because resolution of the instant motions is not dependent upon the contents of Mr. Sweeney's declaration, the District's objections are overruled as moot.

## II. <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56 provides that a party may move for summary judgment on some or all of the claims or defenses presented in an action. Fed. R. Civ. P. 56(a)(1). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." <u>Id.</u>; <u>see</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986). The movant bears the initial burden of demonstrating the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file that establish the absence of a triable issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). If the moving party meets this initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. <u>See</u> <u>Celotex</u>, 477 U.S. at 324; <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).

"On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts.'" <u>Ricci v. DeStefano</u>, 129 S.Ct. 2658, 2677 (2009) (quoting in part <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." <u>Anderson</u>, 477 U.S. at 248. A factual disputes is genuine if it "properly can be resolved in favor of either party." <u>Id.</u> at 250. Accordingly, a genuine issue for trial exists if the non-movant presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. <u>Id.</u>

## III. <u>DISCUSSION</u>

### A. TURNOUT GEAR CLAIM

Plaintiffs' first claim under the FSLA is based on the theory that District is required to compensate them for the time between their arrival at their home station to pick up their turnout gear and the time they arrive at the assigned temporary station before their shift

begins, and vice-versa after the end of their shift. As a general matter, the FLSA requires employers to pay employees for all "hours worked." See 29 U.S.C. §§ 206, 207. The Portal-to-Portal Act of 1947, 29 U.S.C. §§ 251-62, amended the FLSA, however, and relieves employers of the obligation to compensate an employee for "activities which are preliminary to or postliminary to [the] principal activity or activities" of a job. Ballaris v. Wacker Siltronic Corp., 370 F.3d 901, 910 (9th Cir. 2004) (quoting in part 29 U.S.C. § 254(a)(2)). "The words 'preliminary activity' mean an activity engaged in by an employee before the commencement of his 'principal' activity or activities, and the words 'postliminary activity' mean[] an activity engaged in by an employee after the completion of his 'principal' activity or activities." 29 C.F.R. § 790.7(b).[4]

In Steiner v. Mitchell, the Supreme Court carved out an exception to the Portal-to-Portal Act to ensure that not all "preliminary or postliminary" activities go uncompensated. 350 U.S. 247, 252-53 (1956). Specifically, Steiner held that preliminary and postliminary activities are compensable if they are an "integral and indispensable part of the [employee's] principal activities[.]" Id. at 256. "[A]ny activity that is 'integral and indispensable' to a 'principal activity' is itself a 'principal activity' under section 4(a) of the Portal-to-Portal Act." IBP, Inc. v. Alvarez, 546 U.S. 21, 37 (2005). Under the continuous workday doctrine, once an individual performs a principal activity, his workday starts and he will generally be compensated for his activities performed thereafter, until the end of his shift. Id. at 37.

In cases where the disputed activity consists of donning and doffing of uniform or work-related gear, the Ninth Circuit employs a "three stage inquiry" to determine whether a preliminary or postliminary activity is compensable under Steiner. Bamonte v. City of Mesa, 598 F.3d 1217, 1224 (9th Cir. 2010). The first stage considers whether the activity constitutes "work"; the second stage considers whether the activity is "integral and

[4] An employee's commute to and from the employer's premises is considered non-compensable commute time. Rutti v. Lojack Corp., Inc., 596 F.3d 1046, 1051 (9th Cir. 2010) (citing 29 U.S.C. § 254(a)(2)).

indispensible"; and third stage addresses whether the activity is de minimus. Id. Though this is not a donning and doffing case per se, the analytical framework set forth in Bamonte is nonetheless germane.

**1. Work**

"Work, the Supreme Court has long noted, is physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer." Id. at 1220-21 (internal quotation marks omitted). Both of these conditions must be satisfied in order for an activity to qualify as "work." Id. at 1224-25. Here, Plaintiffs satisfy neither condition.

First, the District only requires that firefighters have their turnout gear ready and accessible when they start their shift, wherever that may be. The District does not require or direct firefighters to maintain their turnout gear at their respective home stations. Schapelhouman Decl. ¶ 5. Indeed, Plaintiffs Sweeny and Grady admitted as much during their depositions. See Solomon Decl. Ex. 1 ("Grady Depo.") at 25:6-11, 25:19-23; id. Ex. 2 ("Sweeney Depo.") at 29:7-31:18, Dkt. 40-2.

Second, Plaintiffs have failed to show or even address that how their decision to leave their turnout gear at their home stations primarily benefits the District. To the contrary, the record shows that Plaintiffs do so for personal reasons. Plaintiff Sweeney testified that he prefers not to bring his turnout equipment home because he viewed it as "cumbersome" and did not want it to be around his wife and children. Sweeny Depo. at 30:6-31:18. Mr. Grady expressed similar concerns. Grady Depo. at 22:8-17. Having failed to raise a triable issue of fact as to whether packing and transporting their turnout gear is "work," Plaintiffs' FSLA claim fails to pass muster at the first stage of the Bamonte test. See Bamonte, 598 F.3d at 1225 (noting that the failure to demonstrate that the subject activity was work, standing alone, would be fatal to a FLSA claim).

**2. Integral and Indispensible**

The second stage of Bamonte's tripartite inquiry requires an assessment of whether the activity at issue is "integral and indispensable" to a "principal activity." 598 F.3d at

1224. In Bamonte, the court considered the question of whether the time spent by the plaintiff police officers changing in and out of their uniforms and related gear was compensable under the FLSA. The Court held that donning and doffing uniforms was not integral and indispensible to a principal activity because the defendant municipality did not require the officers to engage in such activity at a specified location. The court explained:

> We agree with the district court that it is undisputed in the record that officers other than motorcycle officers retain the complete option and ability to don and doff their uniforms and gear at home. There is no rule, regulation, policy or practice of the City that limits the officers' option in any way. Although logical reasons exist for the police officers not to avail themselves of the at-home option, such as comfort, safety concerns, and exposure of family members to certain substances, these reasons reflect preferences rather than mandates. In sum, donning and doffing of uniforms and related gear are not required by law, rule, the employer or the nature of the police officers' work to be performed at the employer's premises.

Id. at 1231 (emphasis added). Accordingly, the court affirmed the grant of summary judgment for the defendant. Id. at 1232-33.

As in Bamonte, it is undisputed that there is no applicable rule, policy or regulation that requires Plaintiffs to leave their turnout gear at their home station.[5] When a firefighter has accepted a voluntary assignment to a temporary station, he is not required to report first to his home station; rather, the firefighter may commute directly to the temporary station. While the District requires that the gear be readily available, the District also affords firefighters the option of taking their equipment home so that they will not have to first travel to their home station to pick up their equipment before heading to their temporary

[5] Plaintiffs contend that it is inapposite whether the District required them to leave their turnout gear at their home stations. Pls.' Opp'n at 4. Rather, they contend, the salient requirement is set forth in 29 C.F.R. § 785.11, which specifies that "work not requested but suffered or permitted is work time." In other words, the District's awareness that Plaintiffs have been retrieving their turnout gear on the way to a temporary station assignment allegedly is sufficient to justify compensation for such activity. Plaintiffs misunderstand the nature of the "suffered or tolerated" test. The test is applicable only in determining whether work ought to be compensated in the absence of an express employer request to perform that work during off-the-clock hours. See Lindow v. United States, 738 F.2d 1057, 1061 (9th Cir. 1984) (citing 29 C.F.R. § 790.8(a)). The test does not address whether a particular work-related activity is compensable work under the FLSA.

station. Indeed, the District facilitates that option by providing extra gear and gear bags to facilitate the transporting of turnout gear to and from a firefighter's home. Schapelhouman Decl. ¶¶ 5-6.

Furthermore, like the police officers in Bamonte, the firefighters have not shown that the storage of turnout gear at the home station benefits the District in any way. The District's requirement that turnout gear be readily available is equally satisfied whether firefighters store their gear at home or their home station. In addition, as discussed above, Plaintiffs' decision to leave their gear at their home station is for their own personal benefit—not the District's. See Bamonte, 598 F.3d at 1225-26 (noting that the "risk of loss or theft of uniforms, potential access to gear by family members or guests, risk of performing firearm checks at home, discomfort while commuting, risk of being identified as officer while off-duty, and risk of exposing family members to contaminants and bodily fluids from encounters in the line of duty" were "reasons that were of sole benefit to the employee"). The Court thus concludes that Plaintiffs' packing and picking up their turnout gear when they are voluntarily assigned to a temporary station is not integral and indispensible to their principal activity as firefighters.[6]

### B. ANNUAL LEAVE BUYBACK CLAIM

Plaintiffs' second claim alleges that Defendant violated the FLSA by failing to include Annual Leave buy-backs for unused "sick leave" in their regular rate of pay which, in turn, negatively affected their overtime pay. The FLSA requires employers to pay their employees overtime based on one and a half times the employee's "regular rate" for hours worked in excess of 40 hours a week. 29 U.S.C. § 207(a)(2)(c). The "regular rate" of pay "at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee," subject to certain enumerated

[6] Since it is clear that packing and transporting turnout gear from the home station to the temporary station is neither work nor integral and indispensible to a principal activity, the Court need not address whether the activity is de minimus.

exceptions. Id. § 207(e). One exception is for payments made for periods when no work is performed. Id. § 207(e)(2). The exception states that the regular rate should not include:

> Payments for occasional periods when no work is performed due to vacation, holiday, illnesses, failure of the employer to provide sufficient work, or other similar cause . . . ; and other similar payments to an employee which are not made as compensation for his hours of employment.

Id. (emphasis added). The regulations implementing this exclusion reiterate that when an employee is not at work due to vacation or illness but nonetheless is paid, said payment need not be used in calculating the employee's regulate or overtime rate of pay. 29 C.F.R. § 778.218(a). The exclusion also applies when an employee foregoes a vacation but still receives vacation pay in addition to his or her customary pay for all hours worked. Id. § 779.218(a); see Chavez v. City of Albuquerque, 630 F.3d 1300, 1307-309 (10th Cir. 2011) (citing, inter alia, 29 C.F.R § 779.218(a) and holding that "vacation buy back-payments are not part of the regular rate.").

The Ninth Circuit has not yet addressed the issue of whether buy-back compensation for unused sick leave must be included in an employee's regular rate for purposes of the FLSA, and other circuits are split on the issue. In Featsent v. City of Youngstown, 70 F.3d 900 (6th Cir. 1995), the Sixth Circuit held that a cash-out for unused sick leave is not pay for hours worked, and need not be included in the employee's regular rate. Id. at 905. The court reasoned that "awards for nonuse of sick leave are similar to payments made when no work is performed due to illness, which may be excluded from the regular rate" under 29 U.S.C. § 207(e)(2). Id. In contrast, the Eighth Circuit in Acton v. Columbia, 436 F.3d 969 (8th Cir. 2006) reached the opposite conclusion. In its analysis, the Acton court relied on 29 U.S.C. § 207(e), which requires money paid for general or specific work-related duties to be included in the regular rate of pay. Id. at 976-77. Noting that "the primary effect of the buy-back program is to encourage firefighters to come to work regularly over a significant period of their employment tenure," the court concluded that work attendance was a specific work-related duty and that the buy-back payments must be included as remuneration for employment. Id. at 977.

Following Action, as well as a Department of Labor interpretive bulletin, the Tenth Circuit in Chavez held that sick leave buy-backs—but not vacation buy-backs—must be included in the regular rate. 630 F.3d at 1309; see U.S. Dept. of Labor, Wage and Hour Opinion Letter FLSA-2009-10, dated Jan. 16, 2009, 2009 WL 649021. The Chavez court explained this distinction as follows:

> To be sure, both vacation and sick leave buy-back reward attendance, in some sense, because they reward an employee for not taking days off. The key difference lies in the way each type of day off operates. A sick day is usually unscheduled or unexpected, and is a burden because the employer must find last-minute coverage for the sick employee. In contrast, vacation days are usually scheduled in advance, so their use does not burden the employer in the way that unscheduled absences do. An employee has a duty not to abuse sick days, whereas there is no corresponding duty not to use vacation days. Buying back sick days rewards an employee for consistent and as-scheduled attendance, which are the aspects of good attendance that provide additional value to an employer. Thus, sick leave buy-backs are compensation for additional service or value received by the employer, and are analogous to attendance bonuses. In contrast, payments for non-use of vacation days are analogous to holiday work premiums or bonuses for working particular undesirable days.

Id. at 1309-1310.

Plaintiffs urge the Court to follow Acton and Chavez and to find that the District's buy-backs under its Annual Leave program should have been included in Plaintiff's regular rate. The Court disagrees. Both of those cases involved dedicated buy-back programs specifically for sick time.[7] This case is different. The District no longer separates sick leave from vacation time. Rather, the District now maintains an Annual Leave program which makes no distinction between vacation or sick time when time is withdrawn from the Annual Leave Bank. As discussed, under the terms of the governing MOU, Annual Leave accrues pursuant to separate formulas for "sick leave" and "vacation." MOU § 10.1 & Ex. B. However, once sick leave and vacation time have accrued, they are deposited into an Annual Leave Bank. Once in the Annual Leave Bank, the employee's accrued time is

---

[7] The buy-back program in Chavez was for both sick time and vacation time. 630 F.3d at 1307 n.4.

simply treated as Annual Leave, which can be used for both unscheduled and scheduled absences. In other words, an employee may use his or her Annual Leave without regard to the reason the employee is taking time off. Thus, unlike the sick leave buy-back program in Chavez, the District's buy-back of annual leave does not "reward[] an employee for consistent and as-scheduled attendance" and is not "analogous to attendance bonuses." 630 F.3d at 1309-310.

Plaintiffs attempt to make much of the fact that under the MOU, leave time accrues separately on either the vacation or sick leave schedule, and that when time is debited from the Annual Leave Bank, it is classified as either "annual level scheduled" or "annual leave unscheduled." Pls.' Opp'n at 17. According to Plaintiff, "scheduled" leave pertains to vacation time, while "unscheduled" leave pertains to sick time. Id. However, the use of classifications for scheduled and unscheduled leave is for the District's internal scheduling purposes only, and has no bearing on the employee's use of Annual Leave. Indeed, the MOU, which governs the Annual Leave program, makes this point clear, stating that: "All employees shall receive annual leave in lieu of separate vacation and sick leave." MOU § 9.1 (emphasis added).

As an ancillary matter, Plaintiffs also attempt to highlight the fact that the hours accrued at the vacation rate are segregated into an Annual Leave Restricted Bank until they can be scheduled and used. Pls.' Opp'n at 17. Plaintiffs are correct that, as part of the settlement of the Union's grievance in 2010, the first six hours of leave are placed into the Annual Leave Bank, while the remaining hours are placed in an Annual Leave Restricted Bank where they remain—and cannot be used—in the calendar year in which they accrued. Braucht Decl. ¶ 6. However, Plaintiffs ignore that no deductions can be made from the Annual Leave Restricted Bank nor does the District buy-back any leave in that bank. Id. Instead, only at the end of the calendar year in which the leave accrued are those hours are rolled in the Annual Leave Bank where they can be used for any purpose.

Finally, Plaintiffs argue that, as a practical matter, the "vast majority" of them use their Annual Leave for scheduled absences, meaning that any leftover hours cashed-out are,

in effect, for sick leave. Pls.' Opp'n at 18. Plaintiffs provide no evidentiary support for this assertion.[8] In any event, Plaintiffs ignore that the District does not keep track of whether hours withdrawn from the Annual Leave Bank are for sick or vacation time. Nor does it delineate or otherwise dictate how Plaintiffs may utilize the hours in their Annual Leave bank. Thus, even if, in practice, Plaintiffs utilized all of their Annual Leave for scheduled vacations, the fact remains that any hours remaining in the Annual Leave Bank subject to cashing out may be used for any purpose. In sum, the Court finds the Annual Leave buy-backs need not be included in the calculation of Plaintiffs' regular rate of pay.

## IV. CONCLUSION

For the reasons set forth above,

IT IS HEREBY ORDERED THAT:

1. Defendant's motion for summary judgment is GRANTED.
2. Plaintiffs' motion for summary judgment is DENIED.
3. Judgment shall be entered in favor of Defendant.
4. The Clerk shall close the file and terminate any pending matters.

IT IS SO ORDERED.

Dated: March 30, 2012

SAUNDRA BROWN ARMSTRONG
United States District Judge

[8] Plaintiffs cite paragraph 10 of the declaration of Mike Sweeney, one of the Plaintiffs in this action. Pls.' Opp'n at 18. In that paragraph, Mr. Sweeney states that vacation time is scheduled with the division chief in accordance with § 9.3 of the MOU, but makes no mention of whether he or any of the other Plaintiffs use their Annual Leave for vacation.