**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| STEVE BALESTRIERI; KEN BABCOCK; ROBERT S. BLACK, JR.; AARON BLANFORD; TIM BOGNER; DAVID BRAGG; KEVIN BRANDON; RODNEY BROVELLI; THOMAS CALVERT; DAVID CARR; PATRICK CARRILLO; TONY CIARDELLA; GORDON COE; DAN COYLE; ROB DEHONEY; CHRIS DENNEBAUM; DAVID DICKINSON; MARCO DITO; ANTHONY EGGIMANN; TODD ELLIS; JOSEPH L. FIGONE, JR.; ROSS FRAZEE; WILLIAM GILMORE; DANIEL GIRAUDO; JOHN GIRAUDO; MIKE GRADY; GLENN GRANT; MICHAEL HARRINGTON; TROY HOLT; FELKAK M. HOUSE; MICHAEL HUGHES; JANE O'NEIL HUNT; SCOTT HULTON; BRETT JENSEN; SETH JOHNSON; ROBERT JOHNSON; JONATHAN D. JOHNSTON; RONALD KEEFER; RANDALL J. KELLY; MICHAEL LAMB; CHUNG LAI; MIKE LEMOS; EHREN MacDONALD; JASON MARTIN; GREG MAYS; WILLIAM McFARLAND; ERIC McGLENNON; MATTHEW MENARD; MARTIN E. MIJANGOS; GEORGE MILLER; R. JAMES MONTALVO; ANTHONY MORALES; BRENDAN CHARLES | No. 12-15975<br><br>D.C. No.<br>4:10-cv-03102-SBA<br><br><br>OPINION |

2     BALESTRIERI V. MENLO PARK FIRE PROT. DIST.

MURPHY; ANDREW J. MURTAGH;
THOMAS NEYLAW; KENNETH L.
OLIVER; PHIL VAN ORDEN;
CHUCK PAPANGELLIN; CHRIS
PIMENTEL; MATTHEW PRUITT;
JASON PUCCINELLI; JOEY QUADT;
JOHN J. QUADT; JOHN RENNER;
STEVE ROHRER; JEFF SCHREIBER;
KEITH SLADE; THOMAS SMITH;
MICHAEL STAHL; KENNETH STEELE;
STEVE SUSA; MIKE SWEENEY; GARY
TORRE; ROY TRESTER; WALTER
VIDOSH; RICH J. VILLA; JOE
WALLACE; KEVIN WHITE; GREG
WOMBLE; JOHN J. WURDINGER;
MARK ZAMPARELLI,
             *Plaintiffs-Appellants*,

             v.

MENLO PARK FIRE PROTECTION
DISTRICT,
             *Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of California
Saundra B. Armstrong, District Judge, Presiding

Argued and Submitted
April 9, 2014—San Francisco, California

Filed September 4, 2015

Before: Andrew J. Kleinfeld, Jacqueline H. Nguyen,
and Paul J. Watford, Circuit Judges.

Opinion by Judge Kleinfeld

---

## SUMMARY[*]

---

### Labor Law

The panel affirmed the district court's summary judgment in an action brought by firefighters and emergency medical personnel under the Fair Labor Standards Act.

Applying *Integrity Staffing Solutions, Inc. v.* Busk, 135 S. Ct. 513 (2014), the panel held that the plaintiffs were not entitled to overtime for taking their gear to temporary duty stations because this activity was not integral and indispensable to the principal activities the plaintiffs were employed to perform and therefore was "preliminary" or "postliminary" under the FLSA as amended by the Portal-to-Portal Act.

The panel also held that the Menlo Park Fire Protection District did not violate the FLSA by excluding money paid for leave buybacks from the plaintiffs' "regular rate" of pay, which was used to calculate overtime.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Douglas L. Steele (argued) and Thomas A. Woodley, Woodley & McGillivary, Washington, D.C.; Duane Reno, Davis & Reno, San Francisco, California, for Plaintiffs-Appellants.

Suzanne Solomon (argued), Richard Bolanos and Arlin Kachalia, Liebert Cassidy Whitmore, San Francisco, California, for Defendant-Appellee.

## OPINION

KLEINFELD, Senior Circuit Judge:

This is a firefighters' overtime dispute.

Firefighters and emergency medical personnel of the Menlo Park Fire Protection District claim that two of the District's policies violate the Fair Labor Standards Act. They claim entitlement to overtime for taking their gear to temporary duty stations. And they claim that the District's system for paying cash in lieu of unused leave time violates the Act. The district court granted summary judgment in favor of the District. We have jurisdiction under 28 U.S.C. § 1291. Reviewing de novo,[1] we affirm.

---

[1] *Bamonte v. City of Mesa*, 598 F.3d 1217, 1220 (9th Cir. 2010).

# I. TURNOUT GEAR

## A. Facts

Firefighters need special pants, special coats, helmets with hoods, and other gear to fight fires.  The firefighters are issued two sets of turnout pants and coats, made of fire-resistant fabric with reinforced cuffs and reflective stripes, and two bags to store them, so that one is always available while the other set is being laundered.  The District issues only one set of the gear that does not need laundering—helmets and hoods, boots, and so forth.  A firefighter has to have immediate access to his gear at work.

The firefighters are free to take all the gear home with them, and bring it in at the beginning of a shift.  But they generally prefer to leave their gear in the fire station, because of the bulk and dirt, and concerns about exposing their families to the materials on soiled gear.  The Menlo Park Fire Protection District maintains seven fire stations spread over a 30-square mile area within San Mateo County, in California.

The firefighters are organized and have a collective bargaining agreement.  Pursuant to their collective bargaining agreement, firefighters work two consecutive 24-hour shifts, beginning and ending at 8 AM, followed by 96 hours off duty.  Thus a firefighter might work from Monday morning at eight to Wednesday morning at eight, take another shift the following Sunday and Monday, then another the following Saturday and Sunday, and so forth.  Every firefighter gets four days off between shifts.

The turnout gear issues in this case arise from occasions when a firefighter works a shift in a fire station other than his home station. That happens, for example, if a firefighter at another station calls in sick or is on vacation, leaving the station understaffed. Fire stations must be adequately staffed for the contingency of a fire, requiring immediate response by an adequate number of personnel.

Firefighters sign up to be called for visiting shifts when necessary, so assignments are often voluntary although a firefighter may also be ordered to work at another station when necessary. These "temporary assignments" are lucrative because if a firefighter worked his two-day shift at his home station, he is paid at time and a half for overtime on the visiting shift. The call for a visiting shift may come in either when he is at his station or when he is home off duty. A firefighter may be told during his shift that another firehouse could use him, perhaps the next day. Then he can just load his turnout gear into his car after his shift at the home station. He will get paid when he reports at the beginning of the shift at the visiting station, with his gear. If he leaves his gear at his home station and has to pick it up for use at the visiting station, he does so on his own time and will not get compensated for that.

Or the firefighter may get a phone call at home, when he is between shifts, to take an overtime shift immediately at a visiting station. If he left his gear at his home station, he has to go there to get it before reporting to the visiting station. He is paid from the time he got the phone call, not from the subsequent time when he reports to the visiting station. After the visiting shift, the firefighter is free to take his gear home until his next shift, or drop it off at his home station. His pay starts when he gets the phone call.

A firefighter may also get a phone call at home, when he has put himself on the overtime volunteer list.  That list is for firefighters asked whether they would like to take an overtime shift at a visiting station, in addition to the regular shift at their home station.  If the firefighter accepts the volunteer assignment, and has left his gear at work, he has to get it before reporting at the beginning of the visiting shift.  He is not compensated for the time it takes to go to his home station and get his gear.

If a firefighter arrives early for his shift, perhaps showing up at seven in the morning for a shift starting at eight, he may be told to report to a visiting station.  Getting his gear out of his locker and driving over to the visiting station to begin his shift there instead of his home station at eight is not compensated.

The overtime claim at issue is for the time it takes to deal with gear in the two uncompensated situations, the voluntary acceptance of an overtime shift when the firefighter is called at home or asked if he wants it during his shift, and the time to load up gear when the firefighter has come to work early and been told to report to a visiting station.  In the latter situation, he would have had uncompensated time from when he arrived at his home station until the beginning of his shift, but would not have had to spend it loading up his gear.  The firefighters also claim overtime for the time it takes to drop off their gear at their home stations after taking a visiting shift.

Other than the emergency calls, if the firefighter has to drive to his station to get his gear and drive over to the visiting station, he spends a half hour or so doing that without compensation.  This time is compensated in emergency

situations because overtime starts from the phone call, but not when the firefighter volunteers for overtime at a visiting station. If he prefers not to take his gear home with him, he may spend another half hour or so driving his gear to his home station and dropping it off. The firefighters' view is that they ought to get paid for this work-related activity. The District's view is that if the firefighters do not want to spend their own time getting their gear, they do not have to, because they are entitled to take it home with them and have it available without the need to retrieve before going to the visiting station.

## B. Analysis

Most work requires people to do some things before they start that they would not do otherwise. A construction worker may put on steel-toed boots less comfortable than the shoes he wears to the mall on Saturday and load up his tools in his car. A lawyer may put on a suit and tie that he does not wear to the mall on Saturday. And both, like many other workers, may drive to their work locations, park, and walk to where they work, before they go on the clock. And both may as a formal or practical matter be required to do these things for work, even though they do not get paid for them. So what counts as compensable work, what counts as overtime? This question has turned out to be important, for calculating overtime, and difficult.

This overtime case must be decided under the Fair Labor Standards Act as amended by the Portal-to-Portal Act of 1947. The Act excludes from compensable work, and overtime computation, commuting time and activities that are "preliminary" or "postliminary" to the "principal . . . activities" that the employee "is employed to perform":

(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

(2) activities which are preliminary to or postliminary to said principal activity or activities,

which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.[2]

No one would expect to pay an office worker for the time it takes to shave and put on a suit and tie. Everyone expects to pay an electrical worker for the time it takes to carry conduit from the pile of construction materials at the site to the location on the site where the conduit is to be installed.

The issue in this case is whether, in the disputed circumstances, a firefighter's activities of collecting and loading into his car his turnout gear, and driving it to a station other than his home station, are "preliminary" or "postliminary" to the "principal activities" for which firefighters are employed. The district court held that as a matter of law they are and thus uncompensable under the Act. We agree.

After the enactment of the Fair Labor Standards Act of 1938, the Supreme Court held in *Tennessee Coal, Iron &*

---

[2] 29 U.S.C. § 254(a).

*Railroad Co. v. Muscoda Local No. 123* that the time miners spent on their difficult and dangerous trip, largely underground, after checking in for work, on their way to the working face, was compensable work under the Act.[3] *Anderson v. Mt. Clemens Pottery Co.* held that the minimum necessary time spent walking from the time clock to the pottery workers' benches "along clean, painted floors of the brightly illuminated and well ventilated building" where they were free to take whatever route they wished and make personal visits along the way, counted as compensable work for overtime purposes, just as much as the dangerous and difficult miners' underground movement.[4]

Congress responded to these and lower court decisions with the Portal-to-Portal Act of 1947, finding that the Fair Labor Standards Act had been "interpreted judicially in disregard of long-established customs," creating "wholly unexpected liabilities, immense in amount and retroactive in operation," that would "bring about financial ruin" or "seriously impair the capital resources of many [employers]."[5]     The Portal-to-Portal Act narrowed the coverage of the Fair Labor Standards Act.[6]     It added the "preliminary" and "postliminary" language that is the focus of many cases since, including this one.

---

[3] 321 U.S. 590, 598 (1944).

[4] 328 U.S. 680, 683, 691 (1946).

[5] 29 U.S.C. § 251(a).

[6] 29 U.S.C. § 254(a).

Much of the case law since the Portal-to-Portal Act has addressed "donning and doffing." *Steiner v. Mitchell* held that the time spent changing clothes at the beginning and showering and changing at the end of the workday, for protection from the dangerously caustic and toxic materials they worked with, was not "preliminary" or "postliminary."[7] The explanation was that this donning and doffing, required by law and for worker safety, was "an integral and indispensable part of the [workers'] principal activities."[8]  In *Alvarez v. IBP, Inc.*, we had held that donning and doffing required protective clothes and gear before cutting meat was integral and indispensable to the activity of cutting meat.[9]  On review, our decision was affirmed, though the issue before the Court was not the donning and doffing, but rather the walking between the locker room and the meat cutting station.[10]  In its consolidated opinion, the Court affirmed in part and reversed in part a First Circuit decision, and held that time spent waiting to don and doff at a poultry processing plant was not compensable for overtime purposes.[11]  The Court compared this sometimes necessary waiting time to the necessary time spent walking from the time clock to the work station in *Anderson v. Mt. Clemens Pottery Co.*, and since it was "indisputable" that the walking time was excluded under the Portal-to-Portal Act, even though it was necessary, the

---

[7] 350 U.S. 247, 250–51 (1956).

[8] *Id.* at 256.

[9] 339 F.3d 894, 903 (9th Cir. 2003), *aff'd on other grounds*, 546 U.S. 21 (2005).

[10] *IBP, Inc. v. Alvarez*, 546 U.S. 21, 32 (2005).

[11] *Id.* at 42.

waiting time to don and doff was excluded.[12] The reason was that the waiting time was "two steps removed from the productive activity," too far removed to be "integral" to slaughtering chickens.[13]

We held in *Ballaris v. Wacker Siltronic Corp.* that donning and doffing special gowns, for the employer's benefit, to work in clean rooms of a chip manufacturer (where a tiny speck of dust ruins what may be an expensive computer chip), was compensable.[14] Our decision rested on two factors, that the donning and doffing was for the benefit of the employer, and that the employer required it.

But in *Bamonte v. City of Mesa*, we held the other way, limiting *Ballaris*.[15] *Bamonte* holds that the time police officers spent donning and doffing their uniforms at the station was not compensable under the Fair Labor Standards Act.[16] We distinguished *Ballaris* on the ground that the police officers could don and doff at home if they wished, so donning and doffing at the police station was not required or for the employer's benefit.[17] As in the case before us now, the police officers had reasons for not performing the activity at home, such as risk of access by family members to

---

[12] *Id.* at 41.

[13] *Id.* at 42.

[14] 370 F.3d 901, 912 (9th Cir. 2004).

[15] 598 F.3d 1217 (9th Cir. 2010).

[16] *Id.* at 1225.

[17] *Id.* at 1225–26.

firearms and exposure of family members to contaminants and bodily fluids.[18]  But these reasons, for the benefit of the employees and not the employers, were not enough to make changing at the police station compensable work.[19]

The case before us, unlike those above, is not a donning and doffing case.  We addressed issues other than donning and doffing in *Busk v. Integrity Staffing Solutions, Inc.*[20] Warehouse workers at Amazon had to go through a security check on their way out of the building, to protect the company from theft.  We held that "preliminary" and "postliminary" activities remain compensable under the Fair Labor Standards Act if "integral and indispensable" to the "employees' principal activities," a requirement met if they were "necessary to the principal work performed" and "done for the benefit of the employer."[21]  We held that this test was satisfied because the security check had to be done at the premises, it was for the benefit of the employer (preventing employee theft), and the employer required it.[22]

But we were reversed.  In *Integrity Staffing Solutions, Inc. v. Busk*, the Supreme Court held unanimously that the time waiting to clear security on the way out was not compensable

---

[18] *Id.* at 1220.

[19] *Id.* at 1225–26.

[20] 713 F.3d 525 (9th Cir. 2013), *rev'd*, 574 U.S. ____, 135 S. Ct. 513 (2014).

[21] *Id.* at 530 (internal quotation marks omitted).

[22] *Id.* at 531.

14     BALESTRIERI V. MENLO PARK FIRE PROT. DIST.

under the Fair Labor Standards Act.[23]   Even though the employer required the security check before the employee could leave the building and go home, the Court held that it was "postliminary."[24]   The Court held that "[t]he security screenings . . . were not 'integral and indispensable' to the employees' duties as warehouse workers."[25]   The Court notes that the employer "could have eliminated the screenings altogether without impairing the employees' ability to complete their work," which was getting products off the shelves and packaging them for shipment.[26]   They were hired to do that, not to go through security screenings.   The Court said that we "erred by focusing on whether an employer *required* a particular activity" because "[t]he integral and indispensable test is tied to the productive work that the employee is *employed to perform*."[27]   "If the test could be satisfied merely by the fact that an employer required an activity, it would sweep into 'principal activities' the very activities that the Portal-to-Portal Act was designed to address."[28]   The Court held that our "for the benefit of the employer" test was "similarly overbroad."[29]

---

[23] 574 U.S. ____, 135 S. Ct. 513, 518 (2014).

[24] *Integrity Staffing*, 135 S. Ct. at 518.

[25] *Id.*

[26] *Id.*

[27] *Id.* at 519.

[28] *Id.*

[29] *Id.*

Under *Integrity Staffing*, it is not enough to make activity compensable under the Fair Labor Standards Act that the employer requires it and it is done for the benefit of the employer.  Even activities required by the employer and for the employer's benefit are "preliminary" or "postliminary" if not integral and indispensable to "the productive work that the employee is *employed to perform*."[30]  "[A]n activity is integral and indispensable to the principal activities that an employee is employed to perform—and thus compensable under the FLSA—if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities."[31]

Applying *Integrity Staffing* to the present case, the correctness of the district court's decision is plain.  When the firefighter has put his name on the list for overtime calls, he is free to take his gear home, and if he gets a call, he can go to the visiting station for the assigned shift without even stopping by his home station.[32]  Thus, driving to the home station first is not "indispensable" to the firefighters' principal activities.[33]  If the firefighter has come to work early, as plaintiffs' evidence suggests they sometimes do, and then must spend what was expected to be leisure time before the shift, gathering and transporting turnout gear to a visiting

---

[30] *Id.*

[31] *Id.*

[32] *Cf. Bamonte*, 598 F.3d at 1225–26 (rejecting the argument that donning and doffing protective gear is integral and indispensable to an employee's principal activities when the employee chooses to keep the protective gear at work but is not required to do so).

[33] *Integrity Staffing*, 135 S. Ct. at 518.

station, that activity is "preliminary" because it is not "intrinsic" to the firefighting activity that he is employed to perform.

The Fair Labor Standards Act says expressly what firefighters are employed to do: they are "employed by a fire department of a municipality," have "the legal authority and responsibility to engage in fire suppression" and are "engaged in the prevention, control, and extinguishment of fires or response to emergency situations where life, property, or the environment is at risk."[34]  Loading up turnout gear to report to a shift at a visiting station is "two steps removed" from that activity, not "integral and indispensable" to it.[35]

## II.  ANNUAL LEAVE BUYBACK

The Fair Labor Standards Act generally requires employers to pay time-and-a-half for overtime.  The language used is "one and one-half times *the regular rate* at which he is employed."[36]  One cannot multiply the "regular rate" by 1.5 without knowing what the "regular rate" is, and that can be a complicated question.  The parties dispute whether the district court, which accepted the District's exclusion of money paid for leave buybacks from the "regular rate," got it right.

The statute defines the "regular rate" to mean "all remuneration for employment," subject to eight listed

---

[34] 29 U.S.C. § 203(y).

[35] *Integrity Staffing*, 135 S. Ct. at 518 (quoting *IBP, Inc. v. Alvarez*, 546 U.S. 21, 42 (2005)) (internal quotation marks omitted).

[36] 29 U.S.C. § 207(a)(1) (emphasis added).

exclusions and various qualifications.[37]  The one that matters here is the exclusion from the "regular rate" of "payments made for occasional periods when no work is performed due to vacation, holiday, illness . . . . and other similar payments to an employee which are not made as compensation for his hours of employment."[38]   The regulations issued by the Department of Labor call such compensation "pay for certain idle hours,"[39] and interpret the statute similarly to exclude vacation leave buybacks from the regular rate:

> (a) *Sums payable whether employee works or not* . . . . Suppose an employee who is entitled to such a paid idle holiday or paid vacation foregoes his holiday or vacation and performs work for the employer on the holiday or during the vacation period. If, under the terms of his employment, he is entitled to a certain sum as holiday or vacation pay, whether he works or not, and receives pay at his customary rate (or higher) in addition for each hour that he works on the holiday or vacation day, the certain sum allocable to holiday or vacation pay is still to be excluded from the regular rate. It is still not regarded as compensation for hours of work if he is otherwise compensated at his customary rate (or at a higher rate) for his work on such days. Since it is not compensation for work it

---

[37] *Id.* § 207(e).

[38] *Id.* § 207(e)(2).

[39] 29 C.F.R. § 778.218.

may not be credited toward overtime compensation due under the Act . . . .[40]

The regulations do not discuss sick leave buybacks one way or the other.  They do, however, interpret the statute *not* to exclude from the "regular rate" "promised bonuses" such as "attendance bonuses."[41]  The firefighters argue that we should interpret buyback of sick leave as an attendance bonus, and count it in the regular rate.

The Sixth Circuit rejects the firefighters' view. *Featsent v. City of Youngstown* holds that payments for unused sick leave are "similar to payments made when no work is performed due to illness," which the statute expressly excludes from the regular rate.[42]

But in some circumstances, the firefighters' argument, that buybacks of sick leave amount to bonuses for attendance and should count as part of the regular rate, is supportable. The Department of Labor deemed sick leave buyback to be an includable promised bonus in an Opinion Letter, where the collective bargaining agreement provided that "[a]ll employees will be eligible for a stipend for perfect attendance."[43]  The Department explained that under those facts, buybacks of sick leave should count as part of the

---

[40] 29 C.F.R. § 778.219.

[41] *Id.* § 778.211.

[42] 70 F.3d 900, 905 (6th Cir. 1995).

[43] U.S. Dep't of Labor, *Opinion Letter FLSA2009-19* at 4 (Jan. 16, 2009), *available at* http://www.dol.gov/WHD/opinion/FLSA/2009/2009_01_16_19_FLSA.pdf [hereinafter *Opinion Letter*].

"regular rate" "because the stipends are attendance bonuses," and "perfect attendance stipends encourage employees not to use or abuse sick leave."[44]  "Attendance bonuses" count as part of the "regular rate" under the Regulations.

Likewise, the Eighth and Tenth Circuits have so determined, in the circumstances before them.  A split decision in *Acton v. City of Columbia* holds that where sick leave buybacks were conditioned on several years of coming to work regularly, they functioned as a nondiscretionary reward for regular workplace attendance, so counted as part of the regular rate.[45]  *Chavez v. City of Albuquerque* holds that sick leave buybacks are generally in the nature of attendance bonuses, which count as part of the regular rate, because of employers' incentives to reduce unscheduled leave that burdens an employer with finding a replacement.[46]

Both views are debatable.  Buying back unused sick leave is not the same thing as allowing sick employees to stay home.  And it is not reasonable to assume that employers generally want employees to come to work, sick or not. Some employers may perhaps just want warm bodies (perhaps overly warm if feverish) in the chairs, to avoid the nuisance of their absence.  Other employers may prefer, though, to have sick employees stay home, to avoid errors they may make, illnesses they may spread to others at the workplace, and to be decent to their employees.  There is no

---

[44] *Id.*

[45] 436 F.3d 969, 978 (8th Cir. 2006).

[46] 630 F.3d 1300, 1309–10 (10th Cir. 2011).

reason to assume that employers providing sick leave prefer that their employees not use it.

We need not resolve this conflict among our sister circuits in this case because the firefighters cannot prevail under either standard.  First, as noted above, *Featsent* expressly equates sick leave buyback with "payments made when no work is performed due to illness," which are excluded from the regular rate under the statute's plain language.[47]  This reasoning dooms the firefighters' claim at the outset.  Second, even under the rationale of the *Opinion Letter*, *Acton*, and *Chavez*, the firefighters cannot prevail because the District has melded sick leave and vacation leave together into undifferentiated "annual leave."  There is no buyback of sick leave as such, just a buyback of leave, once it accumulates to the point that it affects cash flow too much.  And the District has no perfect attendance or even good attendance bonus built into the leave program.  "The function of the Cashout," the District states without contradiction, "is to mitigate the District's liability for banked leave hours."

The notion of sick leave in this case arises from the way annual leave accumulates.  The District calculates leave under a "Memorandum of Understanding" it and the firefighters adopted under a now-expired collective bargaining agreement.  Their deal is that all firefighters receive "annual leave in lieu of separate vacation and sick leave."  The phrase "in lieu of" means the firefighters no longer get separate vacation leave and sick leave.  The distinction between vacation leave and sick leave survives only in when the leave can be used, not how it is bought back.  Firefighters can take sick leave when they get sick, but can use vacation leave only

---

[47] 70 F.3d at 905.

in the year following accrual.  They have to schedule their
vacations, but, obviously, not their illnesses.  For example, in
2007, a firefighter would accrue six hours per pay period
under what used to be the "sick leave" schedule, and that six
hours could be used in the same year, but the additional hours
accumulated in 2007 under the old vacation leave schedule
could not be used until 2008.  Regardless of which of the old
accrual schedules generated the hours, once usable, any leave
can be used for vacation, not just illness.  Thus what might
have been accumulated under the old sick leave schedule can
now be used to go fishing, not just to stay home with the flu.
Though accumulated under the old "sick leave" schedule, no
leave is "sick leave."  All the hours pour into the same pot,
the only difference being that hours accumulated under the
old vacation leave schedule get poured in the following year,
and vacations should ordinarily be scheduled with the
firefighter's supervisor.

    The firefighters urge that because hours accumulated
under the old vacation leave schedule do not pour into the
unrestricted pot until the following year, buyback should be
treated as a buyback of sick leave.  We cannot see why, since
however the hours in the unrestricted pot were earned, they
get bought back once the pot exceeds 480 hours.  The District
does not even keep track of which of the old schedules
generated which hours in the pot.  The firefighters also urge
that as a practical matter, the buybacks ought to be treated as
buybacks of sick leave, because, as one fireman said in his
declaration, the "vast majority" of firefighters take all the
vacation they are entitled to during the year they may take it.
That declaration does not establish a genuine issue of material
fact, because the "vast majority" does not mean "all," and the
firefighters are not required to use all their unrestricted leave.

22     BALESTRIERI V. MENLO PARK FIRE PROT. DIST.

Some may prefer vacation, some may prefer cash, and they can proceed however they like.

Accordingly, we reject the firefighters' contention that leave buyback should be included in the calculation of the regular rate.

**AFFIRMED.**